WATERGATE WEST, INC., Petitioner

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

George Washington University,
Intervenor.

No. 00–AA–227.

District of Columbia Court of Appeals.

Argued April 4, 2001.
Decided Jan. 30, 2003.

James T. Draude, Washington, DC, for petitioner.

Maureen E. Dwyer, Washington, DC, for intervenor.

Robert R. Rigsby, Corporation Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

TERRY, Associate Judge:

Watergate West, Inc. ("Watergate"), seeks review of an order in which the Board of Zoning Adjustment ("BZA") affirmed the decision of the Zoning Administrator to approve a certificate of occupancy for George Washington University ("GWU") to use a former hotel as a dormitory for some of its students. The site of the building is an R–5–E ("high density") residential zoning district. *See* 11 DCMR § 105.1(a)(5)(E) (1995).[1] The Zoning Administrator held that GWU was entitled as a matter of right to use the building as a dormitory and that it therefore was not required, contrary to Watergate's assertions, to obtain a special exception for that purpose. The BZA affirmed that ruling after a hearing. Watergate filed a timely petition for review in this court.

Watergate owns a cooperative apartment building across the street from the building at issue. Before this court it contends, as it did before the Zoning Administrator and the BZA, that university uses are not permitted in residential zones as a matter of right. Rather, Watergate maintains, a university is required, under 11 DCMR § 210, to obtain a special exception to use any building, and must demonstrate to the BZA that its proposed use is not likely to cause offense to neighboring property because of noise, traffic, number of students, or other objectionable conditions. Further, Watergate argues that the Zoning Administrator and the BZA failed to give effect to the District of Columbia Comprehensive Plan ("the Plan"), which, in Watergate's view, prohibits GWU from using the building as a dormitory. We affirm.

I

In May 1999 GWU purchased the former Howard Johnson Hotel at 2601 Virginia Avenue, N.W., with plans to convert it into a dormitory for 388 students. A few days later, GWU applied to the Department of Consumer and Regulatory Affairs for a certificate of occupancy.

During the processing of this application, Advisory Neighborhood Commission 2–A ("ANC 2–A") wrote a letter to the Acting Zoning Administrator, Armando Lourenco, asking whether GWU needed to obtain a special exception before converting the hotel into a dormitory.[2] The Ad-

---

1. "The R–5 districts are subdivided into R–5–A, R–5–B, R–5–C, R–5–D, and R–5–E districts.... [I]n R–5–D and R–5–E districts a relatively high height and density shall be permitted." 11 DCMR § 350.2.

 The R–5 districts are designed to permit a flexibility of design by permitting in a single district [with certain exceptions not pertinent here] all types of urban residential development if they conform to the height, density, and area requirements established for these districts under [applicable regula-

tions]. The R–5 districts shall also permit the construction of those institutional and semi-public buildings that would be compatible with adjoining residential uses and which are excluded from the more restrictive Residence districts.
11 DCMR § 350.1.

2. The same query was raised in a separate letter addressed to the BZA about two weeks later.

ministrator replied that a dormitory was a matter-of-right use in the R–5–E district where the building was located. The BZA, in turn, informed ANC 2–A of its right to appeal the Zoning Administrator's determination. The certificate of occupancy was issued on July 28, 1999. Both Watergate and ANC 2–A appealed to the BZA on August 2.

At a hearing before the BZA a few months later, Mr. Lourenco testified about the basis for his decision. He said:

> There are two issues, I believe, that the Board needs to consider here. The first one is whether or not the decision of considering this site as a site where, as a matter of right, you can establish that the dormitory was correct. And that of course is intertwined with the issue of the campus plan. And the second issue is whether or not that decision is consistent, as the law requires, with the comprehensive plan.
>
> And I believe the answer to those two questions can only be yes.

As to the first issue, Mr. Lourenco explained that dormitories are permitted as a matter of right in an R–5–E district, and that for this reason GWU's application for a certificate of occupancy met the zoning requirements. He further testified that 11 DCMR § 210, which deals generally with "Colleges and Universities," did not apply in this case because the building site was located off campus. Consequently, GWU's application for a certificate of occupancy was reviewed in the same manner as any other request by a private institution.

Mr. Lourenco also made clear that he did consider the Comprehensive Plan while processing GWU's application for a certificate of occupancy.[3] He explained that the relevant provisions of the Plan sought to prevent GWU from converting existing permanent residential housing into dormitories. However, because the building at issue was a former hotel, *i.e.*, was not and had never been permanent residential housing, these provisions did not apply to GWU's application. To the contrary, Mr. Lourenco reasoned, GWU's use of the building as a dormitory would help to relieve pressure on other housing stock in the area, and thus it furthered the stated goals of the Plan.[4]

ANC 2–A submitted a written report to the BZA which challenged the Administrator's findings and recommended that Watergate's appeal be granted. Watergate maintained that GWU was not entitled as a matter of right to convert the former hotel into a dormitory. Further, it asserted that Mr. Lourenco had failed to apply the Comprehensive Plan, which, according to Watergate, prohibited such university uses outside the campus boundaries.

The BZA affirmed the Administrator's approval of GWU's application for a certificate of occupancy. It held that GWU was entitled as a matter of right, under the zoning regulations, to use the former hotel as a dormitory, and ruled in addition that GWU's use of the hotel as a dormitory was consistent with the relevant provisions of the Comprehensive Plan. Finally, the BZA concluded that neither the Plan nor any zoning regulation required that all of

---

3. Specifically, Mr. Lourenco stated:
 For the record, I want to start by saying that it's incorrect to state or argue that I did not take into account the Comprehensive Plan before the issuance of this Certificate of Occupancy. And since the appellant is complaining of lack of evidence that I considered it, for the record, I did.

4. Mr. Lourenco added that he did not treat GWU's proposal as one for only an "interim use," *see* 11 DCMR § 210.5, because GWU intended to use the building permanently as a dormitory.

GWU's dormitories be located on campus. Indeed, the BZA found that "[n]o other college or university in the District of Columbia is required to house all of its undergraduates on campus."

After setting forth its factual findings, the BZA concluded that the Acting Zoning Administrator "correctly applied the Regulations in making the decision to approve the certificate of occupancy. The Regulations specifically require BZA approval for a dormitory on a campus, but the reach of § 210 does not extend beyond a campus to a use otherwise permitted."[5] The BZA also ruled that despite amendments to the Comprehensive Plan, this court's decision in *Tenley & Cleveland Park Emergency Committee v. District of Columbia Board of Zoning Adjustment* ("TACPEC"), 550 A.2d 331 (D.C.1988), *cert. denied,* 489 U.S. 1082, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989), which held that the Plan was not self-executing, still prevailed:

> The Zoning Commission is the body having exclusive jurisdiction over amendments to the Zoning Regulations. It would be improper for the Zoning Administrator to read the Comprehensive Plan to require an action not provided for in the Zoning Regulations.

Nevertheless, the BZA recognized that the Administrator had considered the Plan and concluded that his "determination that the dormitory was consistent with the Plan [was] a reasonable interpretation of the intent of the Plan...."

## II

Watergate asserts that the BZA and the Administrator misconstrued the applicable regulations in concluding that GWU was entitled as a matter of right to use the former hotel as a dormitory. Watergate also argues that the Administrator and the BZA failed to follow the Comprehensive Plan, which, in Watergate's view, prohibits GWU from using property outside its campus area for student accommodations.

 It is well established that this court "must uphold decisions made by the BZA if they rationally flow from findings of fact supported by substantial evidence in the record as a whole." *Draude v. District of Columbia Board of Zoning Adjustment,* 582 A.2d 949, 953 (D.C.1990). In other words, this court "may not substitute [its] own judgment [for that of the BZA] so long as there is a rational basis for the BZA's decision." *Kenmore Joint Venture v. District of Columbia Board of Zoning Adjustment,* 391 A.2d 269, 276 (D.C.1978) (citation omitted). If the BZA is interpreting its own governing statute and regulations, moreover, we give its construction particular deference. As we recently reaffirmed:

> When the BZA's decision turns on its interpretation of a regulation that agency is charged with implementing, that interpretation must be upheld unless it is plainly erroneous or inconsistent with the regulation.

*Dupont Circle Citizens Ass'n v. District of Columbia Board of Zoning Adjustment,* 749 A.2d 1258, 1262 (D.C.2000) (citations and internal quotation marks omitted).

 It is also settled that the BZA must give "great weight" to "issues and concerns" raised by an Advisory Neighborhood Commission. *See* D.C.Code § 1–261(d) (1999), recodified as amended in

---

**5.** The BZA took note of the "long-standing and consistent interpretation of the Regulations to allow a university to operate a dormitory or apartment house in a residential district without BZA approval as a special exception." Given this consistent interpretation of the regulations, the BZA held that it would have been "arbitrary and capricious" for the Administrator to reject GWU's application.

D.C.Code § 1–309.10(d)(3)(A) (2001). Specifically, the BZA must:

> "elaborate, with precision, its response to the ANC issues and concerns," and ... "articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances." ... While the agency is not required to defer to the ANC's views ... failure to address ANC concerns with particularity is grounds for a remand....

*Levy v. District of Columbia Board of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990) (citations omitted).

■ The Zoning Administrator ruled, and the BZA affirmed, that GWU was entitled as a matter of right to use the former hotel as a dormitory. The basis for this determination was that under 11 DCMR § 330.5(g),[6] an owner of property located in an R–4 or an R–5 district may use that property as a dormitory as a matter of right.[7] The Administrator further held that the special exception provisions of section 210 of the regulations did not apply to the use of the site at issue because it was located off campus.

Watergate contends that GWU should have been required, under section 210, to obtain a special exception from the BZA to use the former hotel as a dormitory. It also argues that the Administrator's and the BZA's construction of the zoning regulations is inconsistent with the notion that GWU's campus plan "must be a plan for developing the campus as a whole." *See* 11 DCMR § 210.4. To allow the university to use the hotel for student accommoda-

tions without first obtaining a special exception is, Watergate asserts, "an unauthorized *de facto* expansion of the campus plan boundaries." Finally, Watergate claims that the Administrator and the BZA misconstrued section 330.5(g) of the regulations. Watergate concedes that section 330.5(g) allows "dormitory" use in R–4 and R–5 districts, but argues that this provision "does not refer to use by a university that is subject to a campus plan."

We reject all of these arguments because we are satisfied that the BZA's construction of the zoning regulations is rational and consistent with the regulatory language. 11 DCMR § 210.1 provides:

> Use as a college or university that is an academic institution of higher learning, including college or university hospital, *dormitory,* fraternity, or sorority house proposed *to be located on the campus* of a college or university, shall be permitted in an R–1 district *if approved by the Board of Zoning Adjustment* in accordance with [another regulation authorizing the BZA to grant special exceptions].... [Emphasis added.]

The BZA ruled, and we agree, that the language in section 210.1 requiring a university to obtain a special exception from the BZA before using a particular building as a dormitory applies only when the property is located on campus. *See also* 11 DCMR § 3108.1, which notes that under section 210 a special exception is required for a "dormitory, fraternity or sorority house *on campus*" (emphasis added). Since the former hotel at issue in this case

---

6. Section 330.5 provides, in pertinent part:
 The following uses shall be permitted as a matter of right in an R–4 district:
 (g) ... fraternity house, sorority house, or dormitory....

7. Districts are zoned in the District of Columbia in a cumulative manner. Accordingly, if a

use is permitted in an R–4 district, it is also permitted in an R–5 district. *See* 11 DCMR § 350.4(a) ("The following uses shall be permitted as a matter of right in an R–5 district: (a) Any use permitted in [an] R–4 district....").

is located off campus, GWU was not and is not required to obtain a special exception to convert it to dormitory use.[8]

While Watergate correctly states that a university must "submit to the [BZA] a plan for developing the campus as a whole," 11 DCMR § 210.4, this regulation does not restrict a university from owning and using property beyond the campus borders, so long as that use is consistent with the applicable zoning restrictions for that site. In *Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Board of Zoning Adjustment,* 644 A.2d 434 (D.C.1994), a citizens association challenged the BZA's decision to approve American University's application to convert a commercially zoned building, located off campus, into a new home for its law school. We affirmed the BZA's order, stating:

> The [proposed site] is located in a commercially zoned district in which a college or university use is permitted as a matter of right.... If the BZA were to attempt to proscribe such matter-of-right use, it would be exercising powers reserved to the Zoning Commission. Under these circumstances, the BZA reasonably concluded that it lacked authority to prohibit the University from acquiring the property for the purpose of using it as a law school.

*Id.* at 436 (citation and footnotes omitted). The same reasoning applies in the case at bar. The former hotel is located in an R–5

district, in which an owner is expressly permitted by the regulations, as a matter or right, to use the property as a dormitory. We hold that the BZA had no lawful reason to prohibit GWU from doing exactly that.

Finally, Watergate argues that 11 DCMR § 330.5(g), which allows a "fraternity house, sorority house or dormitory" use as a matter of right in an R–4 or R–5 district, should not be read to include such uses by universities. This argument simply ignores the plain meaning of the regulation, which does not even hint at such a restriction. As GWU states in its brief, "zoning controls use, not ownership, and the use is expressly permitted whether the property is owned by the university or by a private party." The only authority for treating universities differently from private parties is found in 11 DCMR § 210, which governs zoning within the campus boundaries. No provision exists, in the regulations or elsewhere, which would justify such differentiation between universities and private parties in their use of property located off campus.

For these reasons, we conclude that Watergate has not shown that the BZA's interpretation of the zoning regulations was either plainly erroneous or inconsistent with the regulatory language.

### III

■ Watergate also argues that the Administrator's decision to issue a certificate

---

8. Nor do the cases cited by Watergate require us to hold otherwise. In both *George Washington University v. District of Columbia Board of Zoning Adjustment,* 429 A.2d 1342, 1343–1344 (D.C.1981), and *Levy,* 570 A.2d at 741, the zoning disputes concerned the use of property located on, rather than off, campus.

Moreover, the BZA in its order (Finding of Fact No. 7–G) cites examples of universities using buildings located outside their campus boundaries as dormitories without any special

exceptions: Alban Towers, an apartment building (in an R–5–D district) owned at one time by Georgetown University and used as a dormitory before its recent restoration to apartment use; the former Meridian Hill Hotel (in an R–5–C district) used as a dormitory by Howard University; and Riverside Towers, also an apartment building (in an R–5–D district) converted to dormitory use several years ago by George Washington University.

of occupancy for an off-campus dormitory was inconsistent with the Comprehensive Plan. It maintains that the Plan is enforceable independently of the zoning regulations, even though this court held in *TACPEC* that the Plan "is not self-executing," 550 A.2d at 337, that the Zoning Commission has exclusive authority to amend the zoning regulations, and that the Zoning Administrator has no authority to enforce the Plan independent of the regulations. Watergate takes the position that the Council of the District of Columbia has since overruled the holding in *TACPEC* by amending the Plan.

The Comprehensive Plan was first enacted on April 10, 1984;[9] the land use element of the Plan was enacted almost a year later, on March 16, 1985.[10] In 1986 the Tenley and Cleveland Park Emergency Committee ("TACPEC") challenged a projected real estate development on Wisconsin Avenue, contending that the Plan required a moratorium on any development inconsistent with its provisions, regardless of whether that use was permitted as a matter of right under the zoning regulations. We rejected TACPEC's argument, holding that "the Zoning Commission is the exclusive agency vested with responsibility for assuring that the zoning regulations are not inconsistent with the Comprehensive Plan...." *TACPEC*, 550 A.2d at 341. We further held that "the Comprehensive Plan is not self-executing, and contrary to TACPEC's contention, this statutory language plainly does not evince any legislative intent to impose a moratorium on development in the District." *Id.* at 337.

Watergate contends that amendments made by the Council in 1994, *see* section 112.6 of the Plan, 46 D.C. Register 1462–1463 (1999), have overruled the holding in *TACPEC*, so that the Plan now has independent force above and beyond the zoning regulations. This case, however, does not require us to decide whether the Council has overruled *TACPEC*. Watergate's argument rests on two incorrect assumptions: first, that the Zoning Administrator did not consider the Plan, and second, that the issuance of the certificate of occupancy for use of the former hotel as a dormitory was inconsistent with the Plan. On the contrary, not only did the Administrator consider the Plan, but he, as well as the BZA, rationally concluded that GWU's application did not contravene its provisions. Since the Zoning Administrator considered and correctly applied the relevant provisions of the Plan, the post–1994 status of *TACPEC* is irrelevant.

Mr. Lourenco testified at the BZA hearing that he considered the provisions of the Plan cited by Watergate but that his reading of them supported granting GWU's application to turn the hotel into a dormitory. The BZA agreed, holding that the Administrator's "determination that the dormitory was consistent with the Plan [was] a reasonable interpretation of the intent of the Plan, which addresses generally the pressure on the housing stock occasioned by conversions to dormitories."

Watergate responds that the Plan not only focuses on the problem of GWU's conversion of housing stock into dormitories, but also requires that GWU alleviate this problem by building *all* dormitories on campus. We are not persuaded. There is nothing whatsoever in the Plan that would require GWU to build all of its dormitories

---

9. District of Columbia Comprehensive Plan Act of 1984, D.C. Law 5–76, 31 D.C. Register 1049, effective April 10, 1984.

10. District of Columbia Comprehensive Plan Act of 1984 Land Use Element Amendment Act of 1984, D.C. Law 5–187, 32 D.C. Register 873, effective March 16, 1985.

on campus.[11] In any event, we are fully satisfied that the BZA was correct when it ruled that Watergate and the ANC "have not demonstrated that the conversion of a hotel to a dormitory is inconsistent with the Comprehensive Plan."

In so holding we agree with the Administrator's and the BZA's conclusion that the central concern of the Plan, as far as GWU is concerned, is to alleviate the diminution of housing stock outside GWU's campus boundaries. *See* section 1358.1 of the Plan, 46 D.C. Register 1775 (1999), which states that GWU "must continue to construct student dormitories to alleviate the pressure on the housing stock outside the boundaries of the campus plan." [12] Because the building at issue in this case, a former hotel, was never permanent residential housing at any point in its history, its conversion to a dormitory had no effect whatever on the local housing stock. Thus we conclude that the Administrator and the BZA rationally determined that GWU's application to use the building as a dormitory was consistent with the underlying policy of the Plan.

Watergate further contends that the BZA failed to address the Comprehensive Plan issue "in the manner required for issues raised by the ANC." The BZA specifically noted, however, that "[i]n addressing the issues raised by [Watergate], the Board has also addressed the ANC's issues, since the ANC's resolution was virtually identical to [Watergate's] statement." The record shows that this comment is accurate. *See, e.g., Foggy Bottom Ass'n v. District of Columbia Board of Zoning Adjustment,* 791 A.2d 64, 77 (D.C.2002) (holding that BZA gave sufficient consideration to "the issues and concerns raised by the ANC, which for the most part echoed the issues and concerns raised by the [petitioner]"). The mere fact that the BZA did not agree with the ANC's interpretation of the Plan does not mean that the BZA failed to give the ANC's views "great weight." *See Levy,* 570 A.2d at 746. We hold that the BZA considered all of the ANC's concerns with more than sufficient particularity to satisfy the "great weight" requirement.[13]

## IV

Watergate has failed to show that the approval of GWU's application for a certificate of occupancy was either irrational or plainly erroneous. Both the BZA's construction of the zoning regulations and its

11. We are not saying, of course, that the BZA could not require GWU (or any university) to build additional dormitories—or a specified percentage of its dormitories—on campus, perhaps as a condition of granting a special exception or other zoning relief. Whether the BZA has such authority is a question that is not presented here, and we take no position on it.

12. Nor do the sections of the Plan cited by Watergate suggest otherwise. Section 1325.3 states that GWU's failure to construct dormitories on campus has aggravated the "loss of ... housing stock ... in Foggy Bottom/West End." 46 D.C. Register 1757. While the Plan encourages GWU to build new dormitories on campus, its underlying purpose is to reduce pressure on existing off-campus housing stock. Similarly, section 1327.1(b) declares

that GWU's "campus plan should include sufficient dormitory space for the student body on campus *to alleviate some of the pressure on housing by students.*" 46 D.C. Register 1758–1759 (emphasis added).

13. Watergate also contends that GWU's application for a certificate of occupancy should have been treated as a request for an "interim use," and hence subject to the special exception requirements of 11 DCMR § 210. However, as Mr. Lourenco testified, he did not treat GWU's application as proposing an "interim use" because GWU was not applying for a temporary use of the building but intended to use it indefinitely as a dormitory. Without any evidence to the contrary, there was no rational basis for considering GWU's application as one for an "interim use."

consideration of the Plan were entirely reasonable and not tainted by any legal error. The BZA's order upholding the issuance of a certificate of occupancy for the former hotel to be used as a dormitory is therefore

*Affirmed.*