Dorothy MILLER, Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,**
Respondent,

and

**Allstate Hotel Partnership, Intervenor.**

No. 06–AA–1020.

District of Columbia Court of Appeals.

Argued Nov. 8, 2007.

Decided May 29, 2008.

Andrea C. Ferster, Washington, DC, for petitioner.

Linda R. Singer, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General for the District of Columbia, Edward E. Schwab, then Deputy Solicitor General, and Donna M. Murasky, Senior Assistant Attorney General, filed a brief for respondent.

Whayne S. Quin, with whom Paul J. Kiernan and Mary Carolyn Brown, Washington, DC, were on the brief, for intervenor.

Before WASHINGTON, Chief Judge, and FARRELL and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Petitioner Dorothy Miller seeks review of an order of the District of Columbia Board of Zoning Adjustment (the "BZA") that granted a special exception allowing the intervenor, Allstate Hotel Partnership ("Allstate"), to build a hotel within the Special Purpose District near her residence. Miller contends that the BZA's conclusions of law do not flow rationally from its findings, that the BZA's decision to permit construction of the hotel contravenes the pertinent zoning regulations, and that the decision is premised on a regulatory interpretation that is inconsistent with

the interpretation that the BZA announced in a previous case. Miller also asserts that the BZA failed to consider pertinent policies established by the District's Comprehensive Plan. We affirm the BZA's decision.

## I. Legal Background

District of Columbia zoning regulations provide for the establishment of Special Purpose ("SP") Districts, see 11 DCMR § 500.1 (2003), whose "major purpose" is "to act as a buffer between adjoining commercial and residential areas, and to ensure that new development is compatible in use, scale, and design with the transitional function of this zone district." Id., § 500.2. An SP District "is designed to preserve and protect areas adjacent to Commercial Districts that contain a mix of row houses, apartments, offices, and institutions at a medium to high density, including buildings of historic and architectural merit." Id., § 500.3. Zoning regulations further provide that a hotel or inn is permitted in an SP District only "if approved by the [BZA] as a special exception under [11 DCMR] § 3104, subject to the provisions of [11 DCMR § 512]."[1] Id., § 512.1.

The provision of 11 DCMR Section 512 that is pertinent to this appeal is section 512.5, which states that "the [BZA's] approval of the hotel or inn shall result in a balance of residential, office, and hotel or inn uses in the SP district in the vicinity of the hotel or inn." In adopting section 512.5, the Zoning Commission explained that it was amending "the standards by which the [BZA] evaluates a hotel application" to "require the [BZA] to consider the mixed use nature of the SP District. . . ."

## II. Factual Background

On October 3, 2005, Allstate filed an application with the BZA requesting a special exception to allow construction of a 147–room Courtyard Marriott Hotel at 515 20th Street, N.W. ("the subject site"), in the Foggy Bottom neighborhood. The subject site is currently occupied by a 420–car parking garage, which would be demolished to permit the new construction. The subject site is in an area that is zoned SP–2, meaning that it is designed to support medium-high density development. See 11 DCMR § 500.4.

Petitioner Miller resides at 2440 Virginia Avenue, N.W., approximately five blocks from the subject site, and also serves as the Commissioner representing Single Member District 05 of the Foggy Bottom West End Advisory Neighborhood Commission ("ANC") 2A, the district in which the proposed hotel would be constructed. During the BZA's public hearings concerning the proposed hotel, Miller testified in opposition to the special exception application.

On May 2, 2006, the BZA voted to approve the application, and it issued a final written decision to that effect on August 3, 2006. In its Findings of Fact, the BZA stated that "[t]he area surrounding the property contains a variety of land uses, including university, residential, and office uses" and that "[t]here are no hotels in close proximity to the subject site." The BZA credited a report and testimony presented by the District of Columbia Office of Planning ("OP") and specifically adopted OP's findings that "[t]he makeup of the

---

1. Under 11 DCMR § 3104.1, the BZA is authorized "to grant special exceptions . . . where, in the judgment of the Board, the special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps and will not tend to affect adversely, the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps. . . ."

area is currently skewed toward office and academic uses," that "[h]otel and residential uses are under-represented on this square [Square 122] and neighboring squares," and that "[t]he hotel will improve the balance of uses in the area." [2] In its Conclusions of Law, the BZA found that the proposed hotel will neither be "contrary to the purpose or intent of the Zoning Regulations" nor "adversely affect the surrounding neighborhood," and that "the construction of a hotel will actually improve the balance of residential, office and hotel uses in the area."

Responding to concerns expressed by ANC 2A, the BZA rejected the ANC's assertion that conversion of the subject site to hotel use would result in excess hotel uses. Specifically, the BZA stated that the "proposed hotel will be the only hotel in the vicinity," and that "[w]hile the ANC may prefer a residential project at the site, the choice to develop a hotel does not violate [11 DCMR] § 512.5." The BZA also observed that section 512 "was designed to foster a 'mix' of residential, office and hotel uses, not to favor one use over another."

The BZA granted Allstate's special exception application, concluding that Allstate "ha[d] satisfied the burden of proof with respect to the application for a special exception under [section 512]." On September 7, 2006, Miller petitioned this court to review the BZA's decision. Allstate intervened and thereafter filed a motion to dismiss the appeal on the ground that petitioner Miller lacks standing to challenge the BZA decision. We denied the motion to dismiss, but instructed the parties to address the issue of standing in their briefs on the merits.

## III. Analysis

### A. Standing

The District of Columbia Administrative Procedure Act ("DCAPA") provides that "[a]ny person suffering a legal wrong, or adversely affected or aggrieved, by an order ... of ... an agency in a contested case" may seek judicial review of that order in this court. D.C.Code § 2–510 (2001). This court has adopted a three part test to determine whether a petitioner has standing under the DCAPA to challenge an agency order: the petitioner "must allege (1) that the challenged action has caused [her] injury in fact, (2) that the interest sought to be protected ... is arguably within the zone of interests protected under the statute or constitutional guarantee in question ... and (3) that no clear legislative intent to withhold judicial review is apparent." *Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 421 (D.C.1983) (citation omitted). A petitioner's "injury in fact" must be an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1207 (D.C.2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). While an individual may have standing to protect a purely aesthetic interest,[3] she must assert more than a generalized grievance. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130; *York Apts.*

---

2. The BZA noted that, pursuant to D.C.Code § 6–623.04 (2001), it is required to give "great weight" to OP recommendations. The BZA also acknowledged that it is required by D.C.Code § 1–309.10 "to give 'great weight' to the issues and concerns raised in the affected ANC's written recommendations."

3. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Lujan*, 504 U.S. at 562–63, 112 S.Ct. 2130.

*Tenants Ass'n v. District of Columbia Zoning Comm'n,* 856 A.2d 1079, 1084 (D.C. 2004). To establish standing, a litigant must show "a substantial probability that the requested relief would alleviate [her] asserted injury." *In re Z.C.,* 813 A.2d 199, 202 (D.C.2002) (citing *Lee v. District of Columbia Bd. of Appeals & Review,* 423 A.2d 210, 216 n. 12 (D.C.1980)).

Allstate contends that Miller lacks standing to pursue this appeal, whether as an individual or as an ANC representative, because "she resides more than five blocks from the subject property" and therefore cannot allege any concrete injury from the BZA's decision to approve the proposed hotel; because she cannot assert rights belonging to her neighbors living closer to the subject site; because she alleges what Allstate contends is only a generalized grievance; because the ANC itself may not maintain an appeal;[4] and because Miller's claimed injuries would not be redressed by a decision of this court. Miller argues that she has sufficiently alleged an injury in fact that is not a mere generalized grievance because she asserts, *inter alia,* that the proposed hotel—which, unlike the weekday-and-business-hours-only garage that now occupies the subject site, would operate around the clock—would "degrade even further the residential ambiance of [her] neighborhood," which already is "under siege" from non-residential development.

Having reviewed the parties' arguments as to standing and their arguments on the merits, we conclude that this is a case in which we "need not resolve this complicated standing issue," but may rely instead "on a body of cases which permits us to assume for the sake of argument that a party has standing if the issue clearly must be resolved against that same party on alternate grounds." *Twin Towers Plaza Tenants Ass'n v. Capitol Park Assocs., L.P.,* 894 A.2d 1113, 1117–18 (D.C.2006). We can bypass the standing issue because, as we explain below, we are satisfied that the BZA reasonably interpreted the zoning regulations in approving Allstate's special exception application.

## B. The BZA's Decision
### 1. Standard of Review

In reviewing BZA decisions, our inquiry is "(1) whether the [BZA] made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the [BZA's] conclusions of law follow rationally from the findings." *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 831 A.2d 921, 931 (D.C.2003) (citations omitted). We "will defer to the Board's findings and will not second-guess the Board's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 925 A.2d 585, 589 (D.C.2007) (quotation marks and citation omitted); D.C.Code § 2–510 (2001). "We defer to the BZA's interpretation of the zoning regulations unless its interpretation is plainly wrong or inconsistent with the governing statute." *Kuri Bros. v. District of Columbia Bd. of Zoning Adjustment,* 891 A.2d 241, 244 (D.C.2006); *see also Downtown Cluster of Congregations v. District of Columbia Bd. of Zoning Adjustment,* 675 A.2d 484, 491 (D.C.1996) (the BZA's interpretation of the zoning

4. *See* D.C.Code § 1–309.10(g) ("The [ANC] shall not have the power to initiate a legal action in the courts of the District of Columbia or in the federal courts, provided that this limitation does not apply to or prohibit any Commissioner from bringing suit as a citizen").

regulations is controlling "unless plainly erroneous or inconsistent with the regulation") (citation omitted).

## 2. The BZA Decision

Miller contends that the BZA's legal conclusions did not flow rationally from its findings of fact and that the BZA's decision to approve the special exception application was contrary to law. Specifically, she asserts, the BZA's legal conclusion that the construction of a hotel "will improve the balance of residential, office and hotel uses in the area" cannot be squared with its finding that residential uses are under-represented in the area. She argues that the BZA could not lawfully approve Allstate's application for a special exception to build the proposed hotel because—there currently being no "permanent residential uses" in the SP–2 District—there can be no "balance" of "residential, office, and hotel or inn uses in the SP District in the vicinity of the hotel or inn," as 11 DCMR 512.5 requires.[5] We disagree. The BZA found that *both* residential and hotel uses were under-represented *vis-a-vis* office and academic uses. The BZA's conclusion that a hotel will "improve the balance" follows reasonably from a recognition that adding the proposed hotel will diminish what the BZA found was the under-representation of hotel uses, one of the three types of uses that are to be balanced in an SP District.[6]

Miller's arguments to the contrary reflect an interpretation of section 512.5 that is inconsistent with the regulatory language and that appears to us to be unduly restrictive and logically inconsistent. Miller focuses on "the imbalance between residential uses and non-residential uses" near the subject site, and suggests that the mandate of section 512.5 is that until residential uses exceed or are in equipoise with non-residential uses, no hotel should be allowed. But nothing in the regulatory language mandates this approach toward "balancing"; rather, the regulations look toward a balancing of "residential, hotel, and office uses." Further, although appropriately turning to a dictionary definition of "balance" in the absence of a definition in the zoning regulations,[7] Miller urges a mechanical definition of "balance" that requires "even distribution" and "equipoise"; she asserts that section 512.5 "requires the BZA to disapprove a hotel where the hotel

---

**5.** Miller also argues that the BZA's decision to approve a hotel cannot be squared with its finding that the makeup of the area is "skewed toward office and academic uses." But we think the BZA could reasonably conclude that permitting construction of a hotel will not exacerbate the "skewing" toward office and academic uses in the SP–2 zone.

**6.** We note, moreover, that the BZA relied on Allstate's exhibit (Exhibit 23) that contains a survey of land uses in the SP–2 zone showing not only that hotel uses are under-represented, but also that there is *no* hotel in the SP–2 zone. By contrast, the land use survey identifies three George Washington University dormitories in the SP–2 zone. Although at oral argument Miller denigrated these as not being "permanent residential" uses, and although the dormitories are part of a "college and university" use that is subject to special exception approval under 11 DCMR § 507.1, it remains the case that, at least for some purposes, the zoning regulations treat dormitories as "residential." *See, e.g.,* 11 DCMR § 330.5(g) (providing that dormitories are permitted as a matter of right in R–4 residential districts); 11 DCMR § 1803.2(q) (providing that "floor area for all non-dormitory uses directly associated with 'university or college' shall be considered non-residential"); 11 DCMR § 1523.1 (referring to "residential use other than a dormitory"). Thus, in a sense, the BZA's decision permitted construction of a hotel in an SP–2 zone that already had both office and residential uses, but no hotel uses.

**7.** *See* 11 DCMR § 199.2(g) ("Words not defined in this section shall have the meanings given in Webster's Unabridged Dictionary").

will not 'result in a balance' between all three uses, *weighted equally* " (italics added). She gives less emphasis to the definition that states that to "balance" means to "achieve ... harmony," and she ignores alternative definitions that suggest imprecision and a role for judgment, such as the alternative that defines "balance" as an "integration of elements" achieved "by giving each element its due prominence or significance." [8]

Miller also asserts that "[a]pproval of a hotel would 'result in a balance' only where hotels are under-represented *and* residential and office uses are in equipoise." This assertion, it seems to us, is inconsistent with Miller's assumption that "balance" requires even distribution, because approval of a hotel in that circumstance would likely mean that the new hotel use would *not* be even with the residential and office uses that have preceded it. But even if Miller's interpretation of section 512.5 is reasonable, and even if, as she urges, a residential use of the subject site would be "best in terms of the existing residential neighborhood" that abuts the SP–2 zone, this would not afford us sufficient cause to reject the BZA's interpretation. *See French v. District of Columbia Bd. of Zoning Adjustment,* 658 A.2d 1023, 1033 (D.C. 1995) ("Since the actual language of the regulation could reasonably be read either as the Board reads it or as petitioners read it, we must accept the Board's interpretation").

Contrary to Miller's suggestion, we find nothing in the BZA's decision that implies an interpretation that "the BZA can only disapprove a hotel if it would result in the number of hotels surpassing the number of offices and residential uses." Rather, we think, the BZA's decision reflects its exer-

cise of discretion and judgment about whether, under the circumstances presented, a hotel use would be consistent with the mix of uses to be fostered in the SP–2 zone. *See* BZA Order at 9 (observing that section 512 "was designed to foster a 'mix' of residential, office and hotel uses"); *see also* 11 DCMR § 3104.1 (authorizing the BZA to grant a special exception where in its "judgment," the special exception will be in harmony with the intent of the zoning regulations) and Zoning Commission Order No. 314 (May 8, 1980) at 13, 15 (explaining that the Zoning Commission adopted special controls on hotel uses in SP Districts "to help foster a mix of uses in the SP District" and adopted a hotel-application evaluation standard that would require the BZA "to consider the mixed use nature of the SP District").

■ The BZA's approach was consistent with the type of balancing that the Zoning Commission appeared to have in mind when it promulgated section 512.5. Although the Commission did not define the word "balance" for purposes of section 512.5, the regulatory preamble demonstrates the non-mechanical way in which the Commission used the term. The Commission explained that:

> The desires, needs and requirements of the city's hotel industry are important to the best interest of the city as a whole. Likewise, the strong expressions of the necessity for protecting the city's residential neighborhoods and existing housing stock cannot be ignored or dismissed lightly. In this case, as in most other major contested zoning cases, *the Commission believes that it must strike a balance between the often competing interests at issue. In establishing that*

---

8. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 164–65 (1976). None of the Webster's dictionary definitions is specific to land use.

*balance, which must be the most beneficial for the District of Columbia as a whole, the Commission will satisfy some of the concerns of the participants in this case, and not satisfy others.* The Commission strongly believes that hearing the views of all affected interests, and then attempting to accommodate the concerns of all in the best interest of the city, *achieving a balanced or compromised result,* is an integral part of the zoning process.

Zoning Commission Order No. 314 at 10 (italics added). The Commission's use of the term "balance" to refer to a compromise result that is beneficial for the District as a whole persuades us that the BZA employed a reasonable interpretation when it evaluated Allstate's application by reference to whether the proposed hotel would "improve the balance" of uses in the SP–2 zone. We agree with Allstate that whether construction of a hotel in an SP District would result in residential, office and hotel uses being balanced called for a judgment that the Zoning Commission left to the realm of the BZA's administrative discretion. *See* Zoning Commission Order No. 314 at 13, 15 (noting that "many SP zoned areas may be appropriate for hotel development" while "there are some situations in the SP District where hotels should not be permitted," and contemplating the BZA's "appropriate review of each case").

Miller insists that the BZA's reasoning in this case conflicts with the interpretation that the BZA applied in its prior decision in *Application No. 13151 of Sherry Towers Limited Partnership* (May 4, 1981) ("*Sherry Towers*").[9] The applicant in *Sherry Towers* sought to convert an apartment building located in an SP–2 District to a hotel. There was one other apartment building in the SP–2 District, but no hotel. The BZA denied the special exception application, rejecting the applicant's argument that the regulation "requires a hotel use in the subject SP area where presently there is none." Miller asserts that here, the BZA's reasoning was just the opposite, *i.e.,* that the BZA was *required* to approve the proposed hotel simply because there currently are no hotels in the SP–2 zone.[10] But we see nothing in the BZA's order to suggest that the BZA thought it was *required* to approve the proposed hotel (for the reason that there currently are no hotels in the SP–2 zone, or for any other reason).[11] Rather, it seems to us, the fact that there are no other hotels in the SP–2 zone was one of a number of factors that the BZA recognized *permitted* it to approve the special exception application. Another was that—unlike in *Sherry Towers*—Allstate's proposal was to construct a hotel that would replace a commercial use, rather than a residential use.

9. Our case law recognizes that an agency must explain its deviation from its previous interpretation of its governing regulations. *See Tiger Wyk Ltd. v. District of Columbia Alcoholic Beverage Control Bd.,* 825 A.2d 303, 309 (D.C.2003); *Brentwood Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 661 A.2d 652, 656–57 (D.C.1995).

10. Miller also faults the BZA for relying on its finding that "there are no other hotels in close proximity to the site," arguing that the BZA misunderstood the purpose of section 512.5 as being only to "prevent too many

hotels located too close together." However, we read the BZA's statement as merely an observation pertinent to an assessment of the balance of uses "in the SP District in the vicinity of the hotel," which section 512.5 mandates the BZA to consider.

11. To the contrary, the BZA recognized in its written order that "the Board *may* permit a hotel in the SP district, subject to the following provisions [including section 512.5]" (italics added).

Finally, Miller argues—for the first time on appeal—that approval of the special exception contravenes the provisions of the District's Comprehensive Plan that prescribe "limit[ing] hotel development in areas in which it would have an adverse impact on residential development," 10 DCMR § 1333.1(a)(4), and that specifically recognize that the development of new hotels in *Foggy Bottom* "must be carefully coordinated and reviewed to avoid adverse neighborhood impacts." 10 DCMR § 1331.4.[12] Although we only arguably have discretion to entertain this argument, *see Orius Telecomms., Inc. v. District of Columbia Dep't of Employment Servs.,* 857 A.2d 1061, 1068 (D.C.2004) (noting that "an appellate court has discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law," but citing authority holding that a contention not raised in an administrative appeal may not form the basis for overturning the administrative agency's decision on review), we address it because we can do so summarily. The record makes clear that the BZA carefully considered whether the proposed hotel would adversely affect the neighborhood around it, and concluded that it would not. Specifically, in findings that petitioner does not challenge in this appeal, the BZA found that the "hotel's height will be consistent with the height of most of the buildings in the area," that it will have "inconspicuous" lighting and the "same design elements" as nearby buildings, that the hotel's roof structure will not affect the light and air of neighboring properties, that the hotel will have no "dangerous or objectionable traffic impacts," and that "planned parking spaces will adequately accommodate projected parking demands without spilling over into the adjacent neighborhood." The BZA also specifically noted what structure would be demolished to permit construction of the hotel (noting that "[t]he parking garage"—not a residential structure—"will be demolished"). Thus, even though the BZA did not specifically refer to the Comprehensive Plan in its written order, its approval of the hotel appears to be consistent with the policy guidance that the Plan sets out. *Cf. National Cathedral Neighborhood Ass'n v. District of Columbia Bd. Of Zoning Adjustment,* 753 A.2d 984, 986 (D.C.2000) ("although the BZA is required to 'look to the District elements [of the Comprehensive Plan] for general policy guidance' in passing upon applications, ... nothing in those elements is inconsistent with the Board's reasoned approval of the proposed facility").

For the foregoing reasons, we affirm the decision of the BZA to grant the special exception.

*So ordered.*

---

**12.** 10 DCMR § 112.6 provides that the BZA shall look to the so-called "District elements" of the Comprehensive Plan for general policy guidance and shall consider relevant objectives and policies of the District elements in special exception decisions.