**DORCHESTER ASSOCIATES LLC, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

**Chain Bridge Road/University Terrace Preservation Committee, Intervenor.**

**No. 07–AA–998.**

District of Columbia Court of Appeals.

Argued Feb. 12, 2009.

Decided July 23, 2009.

J<small>UR</small>.2<small>D</small> *Products Liability* § 1555, *supra* note 5.

George R. Keys, Jr., Washington, DC, for petitioner.

John Patrick Brown, Jr., with whom Stephanie A. Baldwin, Washington, DC, was on the brief, for intervenor.

Peter J. Nickles, then Interim Attorney General, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Mary T. Connelly, Assistant Attorney General, D.C., filed a Statement in Lieu of Brief, for respondent.

Before REID and FISHER, Associate Judges, and FERREN, Senior Judge.

REID, Associate Judge:

Dorchester Associates LLC ("Dorchester" or "petitioner") filed a petition for review of the decision and order of the Board of Zoning Adjustment ("BZA" or "Respondent") denying Dorchester's application for a special exception to allow the construction of thirteen single family homes on a single subdivided lot in the Chain Bridge Road/University Terrace section of the District of Columbia. Dorchester challenges: the BZA's factual findings and conclusions pertaining to its proposed storm water management system, tree protection, and the impact of its proposed development on the character of the neighborhood and neighboring properties. Dorchester also contends, in essence, that the BZA exceeded its authority by "imposing a standard of judgment that goes beyond [its] regulations," and hence, the BZA "engage[d] in subjective and arbitrary decision making." Discerning neither legal error nor abuse of discretion, we affirm the agency's decision.

## FACTUAL SUMMARY

The record on review shows that Dorchester filed an application with the BZA in February 2005, seeking special exception for a theoretical lot subdivision on a single lot that would contain 13 detached, single-family homes in the Chain Bridge Road area of the District of Columbia. The homes would be located in the R–1–A Zoning District, as well as the Chain Bridge Road/University Terrace Tree and Slope Protection Overlay District ("CB/UT Overlay"). Four of the thirteen proposed houses, which have street frontage, could be built as a matter of right under the District's regulations for the R–1–A district. The CB/UT Overlay was created in

1999 "to protect and preserve the natural topography, mature trees, stream beds and natural vegetation in the neighborhood ...," as well as "to preserve the park-like setting of the area by regulating alterations or disturbances of terrain, destruction of trees, coverage with impervious surfaces, and by providing for widely spaced residences."[1]

The BZA spent substantial time in 2005 and 2006 reviewing voluminous documents and hearing oral testimony and arguments of the parties, intervenors, interested persons, and government officials regarding Dorchester's application. The hearings consisted of seven sessions—April 26, 2005, July 19, 2005, January 10, 2006, April 11, 2006, July 18, 2006, September 19, 2006, October 31, 2006. Parties supplemented the record throughout the hearings. Dorchester sought to meet the concerns of government agencies and neighborhood residents. The Chain Bridge Road/University Terrace Preservation Committee ("CB/UT Committee" or "intervenors"), which intervened and was given party status, challenged supplemental submissions from Dorchester. And, the government agencies responded to Dorchester's modifications of its proposed project. Three major areas of concern emerged with respect to Dorchester's application for a special exception: (1) Dorchester's proposed storm water management system; (2) tree protection during the construction process; and (3) the "adverse effect" of Dorchester's project, if any, on the "use of neighboring property" (under 11 DCMR § 3104.1) and on "the present character and future development of the neighborhood" (under 11 DCMR § 2516.9).

### Storm Water Management

The District government reviewed Dorchester's proposed storm water management plan. On November 7, 2005, James R. Collier, P.E., Bureau Chief of the Bureau of Environmental Quality, Environmental Health Administration, District of Columbia Department of Health ("DOH"), issued a memorandum which stated, in part:

> The site assessment ... shows that there is no immediate existing storm sewer system available in Chain Bridge Road to provide drainage connection for the entire site, thus making it imperative that a comprehensive on-site storm water management system is required to control the anticipated additional runoff from the proposed development in such a manner that there would be no adverse impact on the receiving creek. The conceptual storm water management plan that has been submitted by the developer and reviewed by the Watershed Protection Division, shows a broad range of best management practices [BMPs] which are intended to treat all the anticipated runoff from the impervious areas of the proposed development.... In general, it is our opinion that if the proposed system of BMPs which technically constitutes a treatment train is fully implemented, the proposed development would meet the District's storm water management requirements.

However, DOH made two recommendations, one of which concerned the prevention of in-stream erosion and stream bank erosion. DOH concluded by indicating that its comments did not cover "erosion and sediment control" because "no plans pertaining to this area have been submitted to the Bureau of Environmental Quality for review." A subsequent April 6, 2006 e-mail from DOH referenced revisions to the conceptual site plan, including "reloca-

---

1. Zoning Commission Order No. 863, Case No. 97–6, June 14, 1999, at 1.

tion of some inlets and a section of the storm water piping system."

In preparation for the July 18, 2006 continued BZA hearing on Dorchester's application, Mary K. Sears, a professional engineer and witness for intervenors, submitted a letter to the BZA, dated July 11, 2006, referencing Dorchester's Revised Storm Water Conceptual Plan, dated June 22, 2006. In her professional opinion, the plan "appear[ed] to meet the storm water management technical parameters required by [DOH]. . . ." Nevertheless, she stated, "the plan has various conflicts and areas of concern with regards to grading, limits of disturbance, storm water management device construction, maintenance, erosion and sediment control and design capacity." In addition, she maintained that "[t]he overflow . . . has not been addressed with respect to offsite runoff. There aren't any proposed measures to ensure that the overflow surface runoff will be non-erosive from the steep slopes. . . ." Ms. Sears elaborated on her written comments during her rather extensive testimony at the BZA hearing and specifically stated: "There has never been a[n] [erosion and sediment] plan . . . submitted."[2] In addition, Maxine Brown–Roberts of the Office of Planning ("OP") commented on the lack of erosion and sediment plans, stating: "The [DOH] also noted that they did not review the plans for erosion and sediment control . . ., as they were not provided."

At the April 11, 2006 hearing, James Afful, a civil engineer and storm water management expert for Dorchester, responded to a BZA question about "long-term sustainability" and maintenance of the devices comprising the proposed storm water management system. Mr. Afful indicated that the devices are precast and Dorchester would follow the manufacturers' recommendations for maintenance and cleaning, and that the homeowners association, not the homeowners, would be responsible for maintenance.[3] Mr. Afful described the proposed system as follows:

> [W]e are looking at two tiers of design. One, we're going to infiltrate as much runoff as possible from the roofs. That's the area that we know we generate a lot of runoff. So we infiltrate that into the . . . exfiltration system. That is a D[istrict of] C[olumbia] standard. So we're going to infiltrate that and then pipe it down underneath into the outflow structure. But before it gets to that outflow structure, we have installed a rain storm device that also is an exfiltration system. . . . It stays and retains the water and then it infiltrates a lot of the water into the ground.
>
> What is over and beyond that goes into the piping system into the outflow. We're trying to minimize the amount of water that goes out downstream.

The outflow of water would be slowed by another device to avoid "erosion velocities that will impact the adjacent property." The remaining water would flow into "an

---

2. In her July 18, 2006 testimony, Ms. Sears recognized that Dorchester's storm water management proposal "does meet and show all the types of devices and best management practices that are acceptable to [DOH] per the design manual for water quality and water quantity." But, she said, the problem was the absence of "a full geotechnical report . . . which would define and characterize the soils that are present on [the] site." She explained the significance of the missing full geotechni-

cal report is the inability to determine whether the soils on the site "actually act as fill"; "if . . . they were determined to be fill soils, a lot of these devices would not be approvable by [DOH]."

3. Although the manufacturer recommends maintenance once every six months, Mr. Afful stated that it would be done every three months.

existing inlet, that is an 18–inch terra cotta [pipe].” A test revealed that the remaining water “comes out into an existing well-defined channel that was walked by [the District's] Watershed Protection Storm Water Management Department.”

Ms. Brown–Roberts of OP, who testified at the July 18, 2006 hearing, confirmed that “[a] homeowners association would be created to handle . . . the maintenance of the storm water management system for each individual lot. . . .” Moreover, “[f]ield percolation tests were . . . conducted,” and showed that the infiltration system, if fully implemented “will meet the District's storm water management requirements.” She asserted that “[t]he conceptual Storm Water Management Plan that has been approved by DOH would prevent runoff from the site.” She reiterated that DOH “did not review the plans for erosion and sediment control . . . , as they were not provided.”

During the September 19, 2006 hearing, the BZA asked James Afful to address Ms. Sears' assertion that the “storm water management concept failed to take into account off-site flows.” Mr. Afful replied that soil tests had been performed, and he explained that the system was designed to “capture any runoff” or “to intercept as much water, if there's any at all, on [the] slopes.” Dorchester would “captur[e] water from the rooftop with the drywells[,]” and then would “provide[ ] an overflow system, . . . in case the drywells get . . . soggy,” and “the overflow system [would] funnel[ ] water” through “eight-inch pipes.” The Chairman of the BZA responded, “[s]o all that water you're anticipating comes down, you need to grab it before it leaves the property?” Mr. Afful agreed that overflow water would be intercepted and any overflow would “infiltrate into a storage tank that would seep into the ground”; there would be a backup

system or “a rain storm device” that would “back[ ] up the water, and then it would allow[ ] [the runoff] to infiltrate.” As he explained earlier, “what we've tried to do is to capture any runoff that comes from the driveway, and then from the trench drains that are associated with them, and then funnel them right through the storm filters and then have them clean it before you go south.” The “backup” tank storage areas would be “oversized” to allow for more water than anticipated. Mr. Afful maintained that Dorchester would reduce the outflow of water from the site “by about 30 percent,” which would “bring the storm water that is leaving the site to 70 percent of its current volume.” In his view, that would constitute “an improvement” over current conditions. In response to a BZA concern, articulated by Ms. Sears, about the viability of the terra cotta pipe, Mr. Afful reported that he had visited the site with Ms. Sears on January 27, 2006, to examine storm water flow at one point, “measure[d] the invert of [a] terra cotta pipe” and concluded that the pipe “has more capacity than what [Dorchester would] release into it.” He asserted that terra cotta pipe, which is “basically hardened clay pipe,” is “durable,” and despite the “traffic loading,” the existing pipe shows no “evidence of destruction at all.”

When he returned for the October 31, 2006 hearing, Mr. Afful noted that percolation tests had been completed and the results submitted to the District. However, he admitted that a geotechnical report had not yet been submitted to the District, but Dorchester planned to obtain such a report. Mr. Afful sidestepped the question whether the District's regulations would preclude use of Dorchester's planned “configuration of the infiltration system” if the geotechnical report revealed fill soil.

## Tree Protection

A tree arborist, Lew Bloch, inspected and rated the health of 64 trees on the Chain Bridge Road project site in 2002. In his July 20, 2002 report to Dorchester, he recommended that a tree with less than a 50% rating should be removed; the ratings ranged from 30% to 85%. Mr. Bloch submitted a tree and slope protection plan on September 1, 2004. The Urban Forestry Administration of the District's Department of Transportation ("UFA/DOT") reviewed Mr. Bloch's submission and recommended that his health assessment and recommendation be accepted, and that Dorchester provide additional specific protection measures. During the April 11, 2006 hearing, Stan Andrulis, architect for the Dorchester project, revealed changes made in response to UFA's concerns. In addition, Tom Bonifant of Bonifant Tree Service, Inc. sent a June 26, 2006 tree preservation plan for the project site to the BZA.

An official of the UFA/DOT, Earl Eutsler, declared at the July 18, 2006 hearing that "certain elements of [Dorchester's] proposal do not meet the threshold of credibility required, in [his] view, to be granted a special exception." Specifically he addressed the interaction between the tree protection plan and the storm water management system, asserting that Mr. Bonifant's report "nowhere describes how his [June 26, 2006] Tree Pr[eserva]tion Plan will manage the threat posed by the installation of storm water management devices next to and directly under several protected trees[,]" particularly trees numbered "32 through 34, 36 and 37 and 48 through 53." In Mr. Eutsler's opinion, "the integration of the storm water management system has not been thoroughly explored or satisfactorily explained." He expressed concern for "old and mature beech trees[,] . . . [a] species . . . known for its general intolerance to disturbance and alteration, both to it and its surroundings[,]" and a tree which "contribute[s] mightily to the park-like character of the neighborhood." He stressed the lack of pre-construction tree preparation: "[N]ot a single preconstruction preservation technique has been employed, much less proposed by any of the arborists involved with the project." Furthermore, Mr. Eutsler did not believe that the tree preservation plan could "satisfy the overlay and the adverse impact question." [4]

Mr. Bonifant addressed Mr. Eutsler's concerns during the September 19, 2006 hearing. According to him, "[a]ll of the experts have agreed that tree roots are very shallow[;] [t]hey're within the first 12, 16 inches of soil." The "disturbance is below that zone" and "[a] tunnel at three feet to six feet will have no impact on . . . any tree." He discounted any negative impact on the beech trees, maintained that "the disturbance to those critical root zones on those trees is well within acceptable limits[,]" and that planned pruning would help to preserve the trees.

---

4. Mr. Eutsler's oral testimony reflected his July 2006 written statement as an arborist for the UFA/DOT, which concluded, in part:

   The [CB/UT] Overlay District was established not to prevent all development, but rather to control and regulate it in such a way that the natural topography and existing vegetation were not unnecessarily degraded or destroyed. . . . To the extent that [Dorchester's] submitted plans are accurate, I do not feel as though the requirements described in 11 DCMR 1565 have been credibly satisfied. The extent of construction that is proposed will almost assuredly not allow for the preservation of the most sensitive trees called for by the applicable regulations. To allow an exception for this plan as it is currently proposed would seriously undermine the regulatory authority of the Tree and Slope Overlay District of the [CB/UT] area.

He pointed out that a severely construction-damaged beech tree in Takoma Park, on which Bonifant Tree Service has worked for many years, remains alive today. However, Edward Milhous, a consulting arborist, testifying for the CB/UT Committee, pointed out that "some jurisdictions ... use the 18 inch critical root criteri[on]," and related his experience in excavating an American Beech tree which had roots extending twenty feet from the base of the tree. He predicted that under Dorchester's proposed tree preservation plan, "the vast majority of the[ ] trees are going to be gone within a few years of completion."

Mr. Eutsler returned for the October 31, 2006 hearing and once again criticized Dorchester's tree preservation plan as not in compliance with the CB/UT overlay regulations:

> The Chain Bridge Road/University Terrace Tree and Slope Overlay District Regulations have been established to preserve and enhance the park-like setting of the area and place strict limitations on several aspects of any proposed development. Chief among these being tree protection.
>
> The regulations not only spell out the number of trees in various size classes that may be removed to accommodate the project, but also demand the preservation of existing mature trees on the site. [Dorchester's] application is in clear violation of the former and has not credibly satisfied the latter.

Mr. Eutsler questioned both the "expertise" of Dorchester's expert and the "techniques" proposed. Dorchester's counsel subjected Mr. Eutsler to rigorous cross-examination, and members of the BZA also posed pointed, technical questions to him. Moreover, the Board asked Mr. Bonifant about his qualifications and experience. Mr. Bonifant, who was licensed in the State of Maryland as a tree expert, acknowledged that he was not certified by the ISA [International Society of Arboriculture], and that the Dorchester project "is probably the largest" with which he has been involved. In response to a BZA question, Mr. Milhous summarized his position of skepticism about Dorchester's proposed tree preservation plans:

> [I]n theory if you could apply all these various techniques and materials to a site, ... it would have a beneficial effect on tree preservation. My problem, as an arborist, is that having worked on over 600 projects, I have never seen these techniques used.
>
> So when somebody says he is going to come in and apply all these theoretical techniques on a site, I got to look back and say I just don't see it happening personally.

### Character of the Neighborhood and Adverse Effect on Neighboring Property

On January 3, 2006, OP submitted a Supplemental Report on the Dorchester proposed project to the BZA. OP informed the BZA that the project "generally meets the requirements of the Zoning Regulations and will not have an adverse impact on the character of the neighborhood." Despite its general support for Dorchester's application for a special exception, OP expressed concerns about the project and "recommend[ed] approval with the following conditions":

1. Reduce the number of lots to 12 to better accommodate all remaining interior lots and to reduce the proposed narrow separation between new structures and adjoining properties to the west and north.
2. Provide information on the remediation for trees removed.
3. Provide a Soil and Sediment Control Plan to DOH for review.

4. Prohibit a "gated" community.
5. Plans approved for each house will be the unit built with some flexibility to allow minor changes when more detailed plans are finalized.
6. Monitor the protection of trees during construction.
7. Retaining walls will be constructed of concrete.
8. [Provide] a revised Site Plan showing the approved changes be submitted prior to Board approval.

Ms. Brown–Roberts' oral testimony at the July 18, 2006 hearing reiterated the concerns and conditions set forth in OP's January 3, 2006 submission. Notably, the Chairperson of the BZA pointedly inquired what OP's position would be if the stated "conditions weren't all adhered to[;] what would the OP's position be? Would it actually not be of approval?" Ms. Brown–Roberts replied: "Right. And I think it would not be of approval." In particular, Ms. Brown–Roberts emphasized the importance of Dorchester reducing the number of lots from 13 to 12, and expressed special concern for the proposed development of Lots 3 and F because even with the additional changes proposed by Dorchester, "the houses will still be towering over the roadway" and "the house on Lot F is in close proximity to the house on the adjacent lot." Consequently, Ms. Brown–Roberts stated, "OP believes that by removing Lot F more space can be created between the houses proposed for Lot[s] C and D and also for more sensitive treatment of the topography on Lots G and H

and I by changing their lot lines and slight rear line in the proposed house locations." OP had remaining concerns about tree preservation, but deferred to UFA/DOT on tree issues.

One other concern of OP centered on whether Dorchester's project proposal meets the purposes and goals of the CB/UT Overlay regulations. Ms. Brown–Roberts elaborated on the reason why the CB/UT Overlay District was established and, generally, how the purposes of the District are achieved:

> Regarding the Chain Bridge Road/University Terrace Overlay District, this was established to preserve and enhance the park-like setting of the [CB/UT] area by regulating alteration or disturbance of terrain, the destruction of trees and ground coverage of permitted buildings and other impervious surfaces by providing for widely spaced residences.
>
> To reach its goal, the overall specific lot occupancy and ground coverage restrictions that work in conjunction with the requirements of the R–1–A Zone and limitation on theoretical lots, the purposes of the overlay [are] outlined in [11 DCMR § ] 1565.2. . . .

Thus, the ultimate question for OP was not whether Dorchester's proposed project "generally meets the requirements of the Zoning Regulation"—it does—but whether the minimum is sufficient to allow approval of a special exception for a project in the CB/UT Overlay District.[5] As Ms. Brown–Roberts testified on July 18, 2006:

---

5. The BZA heard testimony about "the special character" and historic nature of the CB/UT Overlay District. For example, a resident of the area, Robert Sussman, mentioned Battery Kemble Park and its connection to the Civil War, the topography of the area with its plateaus and steep slopes, the historic beech trees, and the existing density of the area.

Rudy Djabbarzadeh, a resident of Chain Bridge Road, a developer and an owner of two other Chain Bridge Road properties, offered testimony concerning the "natural setting" of Chain Bridge Road, with "a National Park on one side of the street," efforts to "perfect[ ]" the existing storm water management system and the impact of Dorchester's

Well, as I said, ... the 13 lots that are here, if you look at the requirements that are outlined in [11 DCMR § ] 2516, ... the setbacks and all that, they do meet that. However, there are some other areas where we think that meeting the minimum is not enough, because this is a special area. We may need to go a little bit beyond the minimum. And so that is where our concern is. So we're generally supportive of the application, but we think that if it's reduced to 12 lots, then we have a better development and that's what we're looking for.

In response to a question, Ms. Brown–Roberts acknowledged that Dorchester "has shown no willingness to reduce the number of units."

Another witness at the July 18, 2006 hearing was David Murphy, representing the National Park Service. He expressed concern about Dorchester's design for the proposed development, describing it as "basically a billboard presentation." He also articulated greater concern about Lot 4 than Lot 3, as well as Dorchester's proposed storm water management system.

On September 12, 2006, counsel for the CB/UT Committee submitted to the BZA a comparative chart of lot sizes and density of existing properties and Dorchester's proposed project.[6] For existing properties, the chart revealed an average property size of 22,778 square feet, an average dwelling size of 3,883 square feet, and a density of 23.39%. For Dorchester's proposal, the chart showed an average lot size of 9,938 square feet, an average dwelling size of 7,731 square feet, and an average density per lot of 77.97%.

At the September 19, 2006 hearing, Stan Andrulis, Dorchester's architect, gave testimony and introduced exhibits refuting the chart submitted by the CB/UT Committee.[7] Dorchester's exhibits were based on 45 of the 48 existing properties for which it was able to locate data about lot size and total building area. Dorchester computed an average lot size of 19,000 square feet for the 45 existing properties compared with 9,900 square feet for its lot sizes. However, Mr. Andrulis maintained that the average total building area for the 45 existing properties is almost 6,500 square feet, rather than the 3,900 square feet shown by the CB/UT Committee's chart, and stated that Dorchester's average total building area is 7,300 square feet.[8] He concentrated on comparative

proposal on that system as well as the effect of the proposed Lots F and D on his properties.

6. On July 18, 2006, Mr. Sussman, Chair of the CB/UT Preservation Committee, in addition to his residency in the area, gave testimony, with visual aids, on the historical significance of the neighborhood, the topography of the area, beech trees, tree roots, tree preservation, and statistics on the size of existing and proposed lots and structures.

7. Dorchester placed substantial rebuttal charts and drawings in the record covering various aspects of its proposed project. The CB/UT Committee opposed Dorchester's submission. In addition, Mr. Eutsler, the UFA/DOT official, submitted a written analysis on October 25, 2006, reiterating UFA/DOT's con-

clusion that Dorchester's proposal would violate 11 DCMR § 1568 concerning the removal of and damage to trees. At its October 31, 2006 hearing, the BZA denied the motion of the CB/UT Committee to exclude and strike Dorchester's September 19, 2006 submission.

8. Using "mean size," Mr. Andrulis demonstrated that the mean size of existing properties is 14,000 square feet compared with 9,600 square feet for Dorchester's properties; and the mean total building area for existing properties is 5,600 square feet, compared with 6,700 for Dorchester. He also noted that for houses built after the Overlay District was created in 1999, the average lot size is 12,500 square feet, compared with Dorchester's 10,000 square feet. Pictures of four homes built between 2000 and 2004 reflected

statistics for homes built after 1999 when the CB/UT Overlay was in effect. He also addressed tree protection issues, including ground disturbance, and the critical root zone for beech trees.

The BZA's January 9, 2007 hearing on the Dorchester application focused on oral comments by BZA members and their reactions to evidence presented. They emphasized the intent of the CB/UT Tree and Slope Overlay regulations—the preservation of the natural topography of the area and the trees "to the maximum extent feasible." They noted "the billboard" effect of the development, its size, and the impact on the park. They were troubled about storm water management issues, specifically the impervious nature of the terrain and the maintenance of the system.

### The BZA's Decision and Order

The BZA made specific findings (No. 27–32) pertaining to the impact of Dorchester's proposed development:

27. [T]he substantially smaller lot and larger dwelling sizes are out of character with the existing neighborhood. Also, the siting of the proposed dwellings, particularly the dwelling on Lot F which is only 11 feet from the neighboring residence, is out of character with the existing neighborhood and inconsistent with the purpose of the Overlay.

28. The Board ... agrees with the testimony presented by the representative from the National Park Service: the development would have a "billboard effect", particularly the proposed dwelling on Lot 3 which would tower over Chain Bridge Road.

29. The Board credits the testimony and report presented by Mary Sears, Civil Engineer and storm water management expert; in particular, findings that: (a) the Applicant did not provide suffi-

cient calculations to determine whether storm water retention and discharge facilities are sufficient to handle the storm water on the property, (b) the proposed storm water management methods are untested, (c) the proposed storm water management methods are not typically used in residential developments, (d) the capacity and constructability of the storm water management system is unknown, and (e) the extensive grading and excavation required for the installation of the system will threaten the survival of protected trees.

30. Because the effectiveness of the proposed storm water system has not been demonstrated, neighboring property owners would not be protected from runoff damage.

31. Because the effectiveness of the proposed storm water system has not been demonstrated, adjacent parkland and parkland stream would not be protected from additional storm water runoff or lower quality of water.

32. The Board credits the testimony and reports presented by the UFA, and the testimony presented by Earl Eutsler. In particular, the Board adopts his findings that: (a) the density and number of houses proposed, and the required infrastructure would fatally damage an overwhelming number of protected trees; (b) although the proposed storm water management is in close proximity to, and in many cases, conflicts with the trees' critical root zones, the tree preservation plan does not adequately detail the necessary construction safeguards; (c) the scope of pre-construction tree pruning is understated, especially the pruning of the sixteen American beech trees.

a low of 8,511 square feet and a high of 18,848 square feet.

These findings substantially mirror the expressed concerns of Advisory Neighborhood Commission 3D. In addition, they reflect points highlighted by OP and UFA/DOT regarding the impact of the Dorchester proposal on the neighborhood and on historic area trees.

In deciding whether to grant Dorchester's requested special exception for "the construction of a theoretical lot subdivision for thirteen one-family homes," the BZA first examined one of two general tests for a special exception, as outlined in 11 DCMR § 3104.1: whether the special exception "will ... tend to affect adversely, the use of neighboring property." [9] The Board concluded that the construction would affect adversely the use of neighboring property because:

> [T]he density of the project would be out of character with the area and inconsistent with the purposes of the Overlay, the proposed home on Lot 3 would tower over Chain Bridge Road creating a "billboard effect", the proposed home on Lot F would be much too close to the neighboring property owner, the proposed storm water management sewers are untested and dependent upon a high level of maintenance which is not guaranteed, the system creates a risk to downstream property owners and neighboring parkland, and the system poses a risk to the critical root zones of the protected trees.

In light of its conclusion that Dorchester's application failed under the general test

for a special exception, the BZA deemed it unnecessary to examine each of the factors under 11 DCMR § 2516. Hence, the BZA limited its section · 2516 examination to whether the Dorchester proposal "met the criteria in subsection 2516.9" which specifies that: "The proposed development shall comply with the substantive provisions of [the Zoning regulations] and shall not likely have an adverse effect on the present character and future development of the neighborhood." The BZA decided that for the same reasons articulated in its subsection 3104.1 analysis, it could not "find compliance" with subsection 2516.9.[10]

## ANALYSIS

Dorchester challenges certain of the BZA findings and apparently the BZA's decision to rely on testimony by District government witnesses, or those presented by the CB/UT Committee, instead of Dorchester's experts. Specifically, Dorchester takes issue with the BZA's finding No. 27 that its "substantially smaller lot and larger dwelling sizes are out of character with the existing neighborhood"; and that Lot F is both "out of character with the existing neighborhood and inconsistent with the purpose of the Overlay." Dorchester contends that "[i]n view of the express purposes of the CB/UT Overlay, a site design which complies in every material respect to the CB/UT Overlay cannot as a matter of law be deemed 'out of character.'" It asserts that "[b]y imposing a standard of judgment that goes beyond the CB/UT

9. In its analysis of the record against section 3104.1, the BZA did not concentrate on the other general test: whether the special exception "will be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps."

10. The BZA rejected the CB/UT Committee's contention that the Dorchester proposal violated 11 DCMR section 1568.1(b) regarding the number of trees that may be removed per

lot. Contrary to the Committee's assertion that subsection 1568.1(b) applies to existing lots rather than lots to be established by the theoretical subdivision, the BZA stated its belief that "the tree removal restrictions, apply to the 13 lots that would be created after subdivision and conclude[d] that the tree removals contemplated for each of these lots are consistent with subsection 1568.1(b)."

Overlay, the Board engages in subjective and arbitrary decision making." In addition, it argues that Lot F was reconfigured so that it is now 25 feet instead of 11 feet from the property line, and in its reply brief lifts up OP's statement that "[t]he proposed development generally meets the requirements of the Zoning Regulations." The CB/UT Committee generally argues that this court must accord great deference to the BZA's findings, and that the Board's interpretation of the special exceptions regulations is proper.

### Standard of Review

■ As we have said repeatedly: "In reviewing BZA decisions, our inquiry is '(1) whether the [BZA] made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the [BZA's] conclusions of law follow rationally from the findings.' " [11] We give deference to the BZA's factual determinations, and "[w]e must uphold the validity of the BZA's findings if they are supported by and in accordance with ... reliable, probative, and substantial evidence." [12] We have defined "substantial evidence" as "relevant evidence which a reasonable trier of fact would find adequate to support a conclusion." [13] We avoid "second[-]guess[ing]" the BZA's decision or substituting our judgment for

that of the Board, and we only reverse a BZA decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." [14]

■ We are mindful that "[t]he BZA is charged with interpreting the zoning regulations promulgated by the District of Columbia Zoning Commission." [15] We rely on the expertise of the BZA and defer to its interpretation of its regulations "unless that interpretation is plainly wrong or inconsistent with the regulations or with the statute under which the BZA acts." [16]

Dorchester has applied for a special exception in an area covered by the CB/UT Overlay. Hence, the regulations applicable to both the CB/UT Overlay and special exceptions govern our review of this case, in addition to the legal principles set forth above. The CB/UT Overlay regulations describe the CB/UT Overlay District as "a residential neighborhood, located at the edge of stream beds and public open spaces, that has steep slopes, substantial stands of mature trees, and undeveloped lots and parcels subject to potential terrain alteration and tree removal." [17] The CB/UT Overlay District reflects a unique topography, including a park-like setting and widely spaced residences, which the District of Columbia seeks to preserve and

11. *Miller v. District of Columbia Bd. of Zoning Adjustment*, 948 A.2d 571, 575 (D.C.2008) (quoting *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 931 (D.C.2003)).

12. *Lovendusky v. District of Columbia Bd. of Zoning Adjustment*, 852 A.2d 927, 932 (D.C. 2004) (quoting *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment*, 816 A.2d 41, 45 (D.C.2003)) (internal quotation marks omitted).

13. *Lovendusky, supra*, 852 A.2d at 932 (citation omitted).

14. *Miller, supra*, 948 A.2d at 575 (citation omitted).

15. *Concerned Citizens of Brentwood v. District of Columbia Bd. of Zoning Adjustment*, 634 A.2d 1234, 1242 (D.C.1993) (citations omitted).

16. *Concerned Citizens of Brentwood*, 634 A.2d at 1242 (citing *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 142 n. 6 (D.C.1991)) (other citations omitted).

17. 11 DCMR § 1565.5.

enhance, in part by regulating construction and the size of lots.[18]

■■■ The requirements contained in the special exceptions regulations also must be met by anyone, as here, who seeks to develop new homes in the CB/UT Overlay District. "The [BZA's] discretion to grant special exceptions is limited to a determination whether the exception sought meets the requirements of the regulation."[19] The burden of proof to show that its proposed development complies with the special exception regulations rests with Dorchester.[20] The special exception regulations are codified at 11 DCMR § 3104 and 11 DCMR § 2516. The general test governing the grant or denial of a special exception is codified at 11 DCMR § 3104.1, and it focuses on whether a special exception "will ... tend to affect adversely, the use of neighboring property...."[21] General criteria applicable to a special exception in a residential area are found in 11 DCMR § 2516.[22] These crite-

---

18. *See* 11 DCMR § 1565.1. The regulations contain specific provisions designed to safeguard and protect the topography and terrain of the CB/UT Overlay District:

> 1565.2   The purposes of the CB/UT Overlay District are to:
> (a) Preserve the natural topography and mature trees to the maximum extent feasible in a residential neighborhood;
> (b) Prevent significant adverse impact on adjacent open space, parkland, stream beds, or other environmentally sensitive natural areas;
> (c) Limit permitted ground coverage of new and expanded buildings and other construction, so as to encourage a general compatibility between the siting of new buildings or construction and the existing neighborhood; and
> (d) Limit the minimum size of lots so as to prevent significant adverse impact on existing infrastructure, especially on traffic and pedestrian safety and to achieve the other purposes listed in this subsection.

19. *Neighbors Against Foxhall Gridlock v. District of Columbia Bd. of Zoning Adjustment,* 792 A.2d 246, 252 (D.C.2002).

20. *Neighbors Against Foxhall Gridlock,* 792 A.2d at 252.

21. 11 DCMR 3104.1 provides:

> The Board is authorized under § 8 of the Zoning Act, D.C. Official Code § 6–641.07(g)(2) (formerly codified at D.C.Code § 5–424(g)(2) (1994 Repl.)), to grant special exceptions, as provided in this title, where, in the judgment of the Board, the special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps and will not tend

> to affect adversely, the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps, subject in each case to the special conditions specified in this title....

22. 11 DCMR § 2516 specifies in part:

> 2516.1   If approved by the Board of Zoning Adjustment as a special exception under § 3104, two (2) or more principal buildings or structures may be erected on a single subdivided lot, subject to the provisions of this section.
> 2516.2   This section applies to construction on a lot that is located in, or within twenty-five feet (25 ft.) of, a Residence District.
>
> . . . .
>
> 2516.4   The number of principal buildings permitted by this section shall not be limited; provided, that the applicant for a permit to build submits satisfactory evidence that all the requirements of this chapter (such as use, height, bulk, open spaces around each building, and limitations on structures on alley lots pursuant to § 2507), and §§ 3202.2 and 3202.3 are met.
> 2516.5  If a principal building has no street frontage, as determined by dividing the subdivided lot into theoretical building sites for each principal building, the following provisions shall apply:
> (a) The front of the building shall be the side upon which the principal entrance is located;
> (b) Open space in front of the entrance shall be required that is equivalent either to the required rear yard in the zone district in which the building is located or to the distance between the building restriction line recorded on the records of the Survey-

ria also center on whether a new residential development is "likely [to] have an adverse effect on the present character and future development of the neighborhood."[23]

■ We detect nothing in the record which even remotely shows, in Dorchester's words, that the BZA "imposed a standard of judgment that goes beyond the CB/UT Overlay" and "engage[d] in subjective and arbitrary decision making." To the contrary, the BZA properly applied the regulatory requirements for both the CB/UT Overlay District and special exceptions to its examination of the extensive record developed during its proceedings.

or of the District of Columbia for the subdivided lot and the public space upon which the subdivided lot fronts, whichever is greater;

(c) A rear yard shall be required; and

(d) If any part of the boundary of a theoretical lot is located in common with the rear lot line of the subdivided lot of which it is a part, the rear yard of the theoretical lot shall be along the boundary of the subdivided lot.

2516.6 In providing for net density pursuant to § 2516.11, the Board shall require at least the following:

(a) The area of land that forms a covenanted means of ingress or egress shall not be included in the area of any theoretical lot, or in any yard that is required by this title;

(b) Notwithstanding any other provision of this title, each means of vehicular ingress or egress to any principal building shall be twenty-five feet (25 ft.) in width, but need not be paved for its entire width;

(c) If there are not at least two (2) entrances or exits from the means of ingress or egress, a turning area shall be provided with a diameter of not less than sixty feet (60 ft.); and

(d) The requirements of paragraphs (b) and (c) of this subsection may be modified if the Board finds that a lesser width or diameter will be compatible with, and will not be likely to have an adverse effect on, the present character and future development of the neighborhood; provided, that the Board shall give specific consideration to the spacing of buildings and the availability of resident, guest, and service parking.

. . . .

2516.9 The proposed development shall comply with the substantive provisions of this title and shall not likely have an adverse effect on the present character and future development of the neighborhood.

2516.10 Before taking final action on an application under this section, the Board shall refer the application to the D.C. Office of Planning for coordination, review, and report, including:

(a) The relationship of the proposed development to the overall purpose and intent of the Zoning Regulations, and other planning considerations for the area and the District of Columbia as a whole, including the plans, programs, and policies of other departments and agencies of the District government; provided, that the planning considerations that are addressed shall include, but not be limited to:

(1) Public safety relating to police and fire concerns;

(2) The environment, relating to water supply, water pollution, soil erosion, and solid waste management;

(3) Public education;

(4) Recreation;

(5) Parking, loading, and traffic;

(6) Urban design; and

(7) As appropriate, historic preservation and visual impacts on adjacent parkland;

(b) Considerations of site planning; the size, location, and bearing capacity of driveways; deliveries to be made to the site; side and rear yards; density and open space; and the location, design, and screening of structures;

(c) Considerations of traffic to be generated and parking spaces to be provided, and their impacts;

(d) The impact of the proposed development on neighboring properties; and

(e) The findings, considerations, and recommendations of other District government agencies.

2516.11 The Board may impose conditions with respect to the size and location of driveways; net density; height, design, screening, and location of structures; and any other matter that the Board determines to be required to protect the overall purpose and intent of the Zoning Regulations.

23. 11 DCMR § 2516.9.

Nothing in this record persuades us that we should withhold the customary deference we owe to an agency's interpretation of its governing regulations. The BZA's interpretation of its regulations is neither arbitrary nor capricious, and it is in accordance with the law pertaining to the CB/UT Overlay District and special exceptions in a residential area. The regulations clearly direct the BZA to focus on the potential adverse effect of a proposed development on the "present character and future development of the neighborhood," [24] and on the use of "neighboring property." [25]

Having determined that the BZA did not exceed its authority, we turn our attention to whether there is substantial evidence in the record "on each material contested issue of fact" to support the BZA's decisions, and whether the BZA's "conclusions of law follow rationally from [its] findings." [26] Three subject areas shaped the BZA's factual findings and conclusions of law—storm water management, tree protection, and the character of the neighborhood and the potential adverse impact of Dorchester's proposed development on neighboring property.

■ Dorchester challenges the BZA's findings on storm water management and its reliance on the testimony of Ms. Sears, the intervenor's engineer, rather than the testimony of the District's DOH, Watershed Protection Division. Dorchester also takes issue with the BZA's conclusion that Dorchester had not demonstrated "the effectiveness of [its proposed] storm water system" and consequently, " 'neighboring property owners' and 'adjacent parkland and parkland downstream' would not be protected from the effects of the storm water runoff."

As the record reveals, Dorchester relied on a number of "best practices" in designing its proposed storm water management system for its proposed development. DOH's WPD advised that "if the proposed system of [best management practices] . . . is fully implemented, the proposed development would meet the District's storm water management requirements." But, the BZA not only credited the testimony of Ms. Sears but also was troubled that Dorchester had not demonstrated the efficacy of the proposed best management practices in the CB/UT Overlay District. In addition, the BZA emphasized that DOH's conclusion was conditioned on two recommendations, one of which concerned the important area of erosion prevention. Indeed, the DOH stated that its comments did not cover "erosion and sediment control" because "no plans pertaining to this area have been submitted to the Bureau of Environmental Quality for review." And, the District's OP, represented by witness Brown–Roberts, noted the lack of erosion and sediment control plans.

■ While Mr. Afful, Dorchester's civil engineer and storm water expert, gave testimony which sought to allay any concerns about Dorchester's proposed storm water management system, the BZA had the authority to credit and weigh the testimony of the experts. Indeed, "an agency as a finder of fact, may credit the evidence upon which it relies to the detriment of conflicting evidence, and [generally] need not explain why it favored the evidence of one side or the other." [27] In sum, our

---

24. 11 DCMR § 2516.9.

25. 11 DCMR § 3104.1.

26. *Miller, supra,* 948 A.2d at 575.

27. *Morrison v. District of Columbia Dep't of Employment Servs.,* 834 A.2d 890, 896 (D.C. 2003) (citing *Metropolitan Poultry and Liberty Mut. Ins. Co. v. District of Columbia Dep't of Employment Servs.,* 706 A.2d 33, 35 (D.C.

review of the record gives us no reason to question the BZA's factual findings concerning the storm water management system, its decisions involving the crediting of testimony and weighing of the evidence, and its conclusions of law since they flow rationally from the BZA's findings.

Nor do we see any reason to reject the BZA's findings and conclusions regarding tree protection since they are based on substantial record evidence. The BZA carefully explored the testimony and recommendations of Dorchester's tree expert, Mr. Bonifant, its architect, Mr. Andrulis, and its tree arborist, Mr. Bloch, as well as the testimony of Mr. Eutsler of DOT's Urban Forestry Administration, and that of Mr. Milhous, a consulting arborist who testified for the CB/UT Committee. The BZA credited and relied on the testimony of Mr. Eutsler, especially that relating to the relationship of the storm water management system and the preservation of trees [including their roots] in the CB/UT Overlay District. Of particular concern to the BZA was the testimony about "the old and mature beech trees" which were known for their "general intolerance to disturbance and alteration [of their] surroundings." Given the testimony of Mr. Eutsler and Mr. Milhous, we are satisfied that there is substantial evidence in the record to support the BZA's findings that Dorchester's preservation plan "does not adequately detail the necessary construction safeguards," and its conclusion that Dorchester's proposed development plans would not shield "an overwhelming num-

ber of trees" from "fatal damage," flows rationally from the record evidence.[28]

Finally, Dorchester takes issue with the BZA's findings relating to the adverse impact of its proposed development on the use of neighboring property and on the character of the neighborhood. Dorchester expresses particular consternation about the BZA's numbered findings 13 (average lot size of the proposed development compared with the average size of the property of current owners), 14 (space between proposed and existing homes), and 27 (smaller proposed lots and larger proposed dwelling sizes). Dorchester claims that these findings "rely on testimony and evidence [especially the testimony of Mr. Sussman for the CB/UT Committee and its exhibits] which was discredited." Dorchester argues that the testimony of its architect, Mr. Andrulis "discredited" that of Mr. Sussman. Of course, the decision as to what testimony should be credited and given the most weight was within the province of the BZA. Similarly, the question as to whether Dorchester's "site design ... complie[d] in every material respect with the CB/UT Overlay [and hence] cannot as a matter of law be deemed 'out of character,'" is committed to the BZA's expertise and its sound discretion, and we see no indication on this record that the BZA abused its discretion by determining that Dorchester's proposed development was out of character with and likely would adversely impact the existing neighborhood.[29]

OP's January 3, 2006, Supplemental Report stated that Dorchester's proposed de-

1998)) (internal quotation marks and other citation omitted).

**28.** *Miller, supra,* 948 A.2d at 575. Dorchester complains that under 11 DCMR § 1568.1(b), it could have "removed up to 39 'protected trees'" from its proposed development of 13 lots, but, as we have said, the BZA was enti-

tled to rely on Mr. Eutsler's testimony that "fatal damage" to countless trees could occur under Dorchester's storm water management system and tree protection plans. *Morrison, supra,* 834 A.2d at 896.

**29.** *See generally Johnson v. United States,* 398 A.2d 354 (D.C.1979).

velopment "generally meets the requirements of the Zoning Regulations and will not have an adverse impact on the character of the neighborhood." Significantly, however, OP expressed concern about the project, and its approval was conditioned on several recommendations, including a reduction in the number of lots from 13–12, the elimination of "the proposed narrow separation between new structures and adjoining properties," and a limitation on the height of buildings on proposed lots E, F, and G. Ms. Brown–Roberts steadfastly underscored the need to reduce the number of lots from 13 to 12 (specifically by eliminating lot F) in order to provide more space between proposed and existing structures, and to help counter "the billboard effect" of the proposed development. Just as steadfastly, Dorchester has resisted the recommendation that one lot be eliminated from its proposed development, but the BZA acted within its province in crediting OP's testimony. Our task is not to "second guess" the BZA or to substitute our judgment for that of the BZA. In short, we are confident that the record contains substantial evidence to support the Board's findings and conclusions about the adverse impact of the proposed development on the character and future development of the neighborhood, and on the use of neighboring properties. The BZA's decision is neither arbitrary nor capricious; and its interpretation of its regulations is in accordance with the law.[30]

Accordingly, for the foregoing reasons, we affirm the agency's decision.

*So ordered.*

---

**30.**  *Miller, supra,* 948 A.2d at 575;  *Concerned*  *Citizens of Brentwood,* 634 A.2d at 1242.